868 So.2d 976 (2004)
Judith D. BEAUMONT
v.
EXXON CORPORATION and Robet A. Balhoff.
No. 2002-CA-2322.
Court of Appeal of Louisiana, Fourth Circuit.
March 10, 2004.
Rehearing Denied April 7, 2004.
*977 Michael R. Allweiss, Marynell L. Piglia, Lowe, Stein, Hoffman, Allweiss & Hauver, L.L.P., New Orleans, LA, for Plaintiff/Appellant.
David M. Rivet, Exxon Mobil Corporation, Houston, TX, and Gregory C. Weiss, Weiss & Eason, L.L.P., and Robert B. McNeal, Monica L. Lacks, Frilot, Partridge, Kohnke & Clements, L.C., New Orleans, LA, for Defendant/Appellee.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge MICHAEL E. KIRBY, Judge EDWIN A. LOMBARD).
Judge MICHAEL E. KIRBY.
In this case the plaintiff/appellant, Judith Beaumont, appeals a Judgment in favor of her former employer, defendant/appellee, Exxon Corporation, which found that plaintiff was not "disabled" or "handicapped" under the Louisiana anti-discrimination statutes; that defendant did not conspire to retaliate in dismissing her; and that defendant did not intentionally inflict emotional distress upon plaintiff. We make one distinction and affirm.

STATEMENT OF THE FACTS
Judith D. Beaumont brought a claim against her former employer, Exxon Corporation ("Exxon"), for disability discrimination, *978 retaliation and intentional infliction of emotional distress, in violation of Louisiana law. See La.Rev.Stat. 46:2251, et seq., Civil Rights for Handicapped Persons; La. Rev.Stat. 51:2231, et seq., Louisiana Commission on Human Rights; La.Rev.Stat. 23:1006, et seq., Louisiana Labor and Workers' Compensation; and the Louisiana Civil Code.
In 1985, Exxon hired Judith ("Judy") Beaumont as an in-house attorney. She initially worked in the litigation section and was subsequently assigned to Exxon's Southeastern Production Division's law group, where she practiced primarily environmental law. She worked in Exxon's New Orleans office.
In June 1990, while in the course and scope of her employment for Exxon, plaintiff suffered injuries in an automobile accident. She sustained a closed head injury, which allegedly caused vision problems, post-concussive syndrome, fibromyalgia[1], memory deficits and impaired concentration. These injuries caused plaintiff to suffer from severe headaches and fatigue.
Plaintiff returned to work at Exxon following the June 1990 accident, working a half-day schedule. Under that schedule, plaintiff would work fewer hours, working both in the office and then at home after she had the opportunity to rest. This informal modification continued for two years under two different supervisors,[2] with plaintiff receiving excellent employee performance appraisals.
When Mr. Robert Balhoff became plaintiff's third post-accident supervisor, he sought to re-assess plaintiff's work schedule. According to Mr. Balhoff, it was due to the fact that after two years Exxon now deemed plaintiff's medical status to be permanent. For whatever reason, good rapport did not exist between Balhoff and plaintiff.
Cassandra Johnson, a former Exxon secretary, testified at trial that Mr. Balhoff investigated daily Ms. Beaumont's whereabouts. According to Ms. Beaumont, Mr. Balhoff did not do this with other attorneys under his supervision. Nevertheless, there was testimony from Tracy Neyrey, a former Exxon employee and Mr. Balhoff, that he did this with other attorneys as well. Mr. Balhoff also prohibited her from driving on company business, even though he had no medical basis for making such a determination.
Mr. Balhoff complained often of plaintiff's unavailability. Nevertheless, at trial Ms. Beaumont produced documents and comments by Karen Cox, an Exxon engineer, which stated Ms. Beaumont was very helpful in many instances within a very short time frame. Due to the problems between plaintiff and her supervisor, plaintiff followed Exxon policy and on December 15, 1992, wrote a letter to her supervisor's superior, Mr. Martens. In that letter she requested to be transferred from Mr. Balhoff's division and requested accommodations. Mr. Martens never responded to this correspondence.
In early May of 1993, a meeting was set to discuss accommodations for the plaintiff. Balhoff specifically told the plaintiff she could not attend. Exxon's medical adviser on Ms. Beaumont's case was Ms. Helen Maher, who has a Ph.D. in nursing. She had not been invited to the meeting, but plaintiff contacted her so that she could *979 make plans to attend. Other attendees at the meeting included representatives of Exxon's human resources and medical departments, as well as Messrs. Balhoff and Martens.
Ms. Maher informed the other Exxon employees in charge of reviewing the plaintiff's schedule as to what accommodations would be medically acceptable. At trial she testified that she had stated in an Exxon internal document that Ms. Beaumont was permanently partially disabled.
At the accommodation evaluation meeting, Mr. Balhoff presented a few negative evaluations and omitted other positive ones. Nevertheless, Mr. Balhoff's evaluation of the plaintiff was very complementary, and he brought this evaluation with him to the meeting.
By May 5, 1993, Beaumont alleges Balhoff was removing environmental files from her case load. Moreover, after asking for a new copier, enlarging machine or laser jet printer in the fall of 1992, ten months had passed and she had yet to receive any of these accommodations.
The result of the Exxon accommodation evaluation meeting was an Exxon proposal, dated May 12, 1993, that made the following recommended accommodation:
To the extent practicable, employee to be available in the office during a normal flex-time schedule as chosen by the employee. Employee to work such additional time outside of normal flex-time as employee deems necessary to satisfactorily handle assigned responsibilities. Employee should be encouraged to pace the work as much as possible to minimize visual stress (e.g., break up periods of tedious reading with less visually stressful work activity). Further, employee should be allowed and encouraged to take such uninterrupted rest breaks as the employee deems appropriate.
The proposal also provided for office equipment upgrades, such as a printer and access to a copy machine. The proposal also stated it would consider providing home internet access to work there as well after hours.
Also on May 12, 1993, Balhoff and Beaumont met. Balhoff requested feedback on the proposal and also presented Beaumont his appraisal of her work performance, which was very good. On that same day, Beaumont sought medical leave at the suggestion of Dr. Marilyn Skinner. Despite requesting medical leave, Beaumont did not claim to be disabled. From May 20, 1993, plaintiff never returned to work at Exxon, even though she did return for negotiations.
According to Dr. Skinner, Beaumont took leave, in part, due to Exxon's "delayed, inappropriate, insufficient efforts to resolve her longstanding plea for reasonable accommodation" and described Balhoff's proposal as "obviously insufficient." However, on cross examination, Dr. Skinner admitted that she actually never reviewed Exxon's draft accommodation proposal, but rather relied on her patient's description of the proposal.
For approximately one year, Exxon paid Beaumont one hundred percent (100%) of her $105,000 annual salary. Plaintiff collected under Exxon's Short Term Disability Plan Insurance, even though plaintiff never filled out the application for disability but only the medical release form. Following the exhaustion of the short term disability insurance and until negotiations failed, Exxon paid Ms. Beaumont around $47,000, through a long term disability policy. On May 12, 1994, Exxon terminated her employment for medical reasons.
*980 Ms. Beaumont admitted that while receiving these monies from Exxon's disability policies she had gone snow skiing, driven regularly and done some work as an independent contract attorney.

TRIAL
Prior to trial Exxon's defense counsel had made ex parte contact with one of plaintiff's physicians. This matter was brought before the trial court and addressed as irrelevant. Dr. Mestayer, did not testify live at trial, rather, portions of his deposition taken several years before trial were read to the jury.
In closing arguments defense counsel alluded to a prior lawsuit, which prompted the trial court to admonish defense counsel and plaintiff moved for a mistrial, which was denied by the trial court.
On appeal plaintiff assigns error to the trial court's wording of the threshold jury interrogatory. Said interrogatory was complex, mainly due to the large content of the Louisiana anti-discrimination statutes and stated:
Do you find that Judith Beaumont was a "handicapped person" under the Louisiana anti-discrimination statutes?
This wording was part of plaintiff's proposed single interrogatory, so plaintiff's counsel did not object to this form. During the jury's deliberation it sent out the following question to the trial judge:
"An impairment is one that prevents one from accomplishing one of life's major functions? This includes work. Does that mean that if she is unable to do a particular job and yet can do another job is she handicapped?"
Ms. Beaumont asked the trial court to give the jury a substantive answer to its question. However, the trial court, in agreement with Exxon, simply sent the jury a copy of the pertinent statute. After nine hours of deliberation, the jury answered "no" to this interrogatory as well as every other. The trial court then made the jury's findings its Judgment.

STATEMENT OF THE LAW
The standard of review for factual findings in this case is that of manifest error. First we must determine if there exists a reasonable factual basis in the record for the jury's finding and, secondly, whether the record establishes that the jury's finding is not clearly wrong. Walden v. Walden, 2000-2911 (La.App. 1 Cir. 8/14/02), 835 So.2d 513, 517, citing Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Errors of law that are prejudicial require a de novo review of the record. Dupre v. Dupre, 02-0902 (La.App. 3 Cir. 12/30/02), 834 So.2d 1272, 1276. However, even if we would arrive at a different conclusion given the evidence in the record, we cannot reverse a finding of fact where there is a reasonable basis for the jury's finding.

Louisiana's Anti-Discrimination Law
The State of Louisiana's anti-discrimination legislation is contained in three distinct titles of the Revised Statutes: Titles 23, 46 and 51. The majority of these anti-discrimination statutes have been amended since the time of the accident in this matter. Since those applicable to this case are not substantive changes, we apply the statutes as amended.
In Title 23 of the Louisiana Revised Statutes, Chapter 3-A treats the topic of prohibited discrimination in employment. La. R.S. 23:323 states:
A. No otherwise qualified disabled person shall, on the basis of a disability, be subjected to discrimination in employment
B. An employer, labor organization, or employment agency shall not engage in any of the following practices:

*981 (1) Fail or refuse to hire, promote, or reasonably accommodate an otherwise qualified disabled person on the basis of a disability, when it is unrelated to the individual's ability, with reasonable accommodation, to perform the duties of a particular job or position.
(2) Discharge or otherwise discriminate against an otherwise qualified disabled person with respect to compensation or the terms, conditions, or privileges of employment on the basis of a disability when it is unrelated to the individual's ability to perform the duties of a particular job or position.
(3) Limit, segregate, or classify an otherwise qualified disabled person in a way in which deprives the individual of employment opportunities or otherwise adversely affects the status of the individual on the basis of a disability when it is unrelated to the individual's ability to perform the duties of a particular job or position.
* * *
[Emphasis added.]
The definitions of the terms "disabled person" and "reasonable accommodation" are found in La. R.S. 23:322, to wit:
* * *
(3) "Disabled person" means any person who has a physical or mental impairment which substantially limits one or more of the major life activities, or has a record of such an impairment, or is regarded as having such an impairment.
(1) "Discrimination" shall include unreasonable segregation or separation.
(2) "Essential functions" means the fundamental job duties of the employment position the disabled person holds or desires. "Essential functions" does not include the marginal functions of the position.
(3) "Impairment" means retardation, any physical or physiological disorder or condition, or prior mental disorder or condition ...
(4) "Major life activities" means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.
(5) "Otherwise qualified disabled person" means a disabled person who, with reasonable accommodation, can perform the essential functions of the employment position that such person holds or desires.
(9) "Reasonable accommodation" means an adjustment or modification to a known physical limitation of an otherwise qualified disabled person which would not impose an undue hardship on the employer. This shall not require an employer to spend more for architectural modifications than that amount now allowed as a federal tax deduction. However, "reasonable accommodation" shall not be construed to impose on any private sector employer, unless required by law or under any contract with a federal, state, or local promotion of a disabled person. Undue hardship is determined on a case-by-case basis taking into account all of the following:
(a) The employee or applicant for which accommodation is to be made.
(b) The specific disability of employee or applicant.
(c) The essential job duties of the position.
(d) The working environment.
The Louisiana Commission on Human Rights[3] La. R.S. 51:2231, et seq., prohibits *982 disability discrimination in connection with employment and public accommodations. La. R.S. 51:2232(11) defines "disability" using the same language as 42 U.S.C.A. 12101, et seq., commonly referred to as the Americans with Disabilities Act.[4]
Finally, La. R.S. 46:2251, et seq., entitled Civil Rights for Handicapped Persons, also prohibits disability discrimination and under La. R.S. 46:2256 preserves all remedies available under the law to a handicapped person who suffers discrimination. La. 46:2253 states:
(1) "Handicapped person" means any person who has an impairment which substantially limits one or more life activities or (a) has a record of such an impairment or (b) is regarded as having such an impairment.
(2) "Impairment" means retardation; any physical or physiological disorder or condition, or prior mental disorder or condition, but does not include chronic alcoholism or any other form of active drug addiction; any cosmetic disfigurement; or an anatomical loss of body systems.
(3) "Major life activities" mean functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning or working.
In this case, the threshold question is whether the plaintiff falls within the meaning of a "disabled person" or "handicapped person" as defined above. If this question is not answered in the affirmative, then plaintiff is not covered by the Louisiana statutes and she has no remedy under them. At the outset we note that the Louisiana anti-discrimination statutes require a case-by-case analysis to avoid an overly broad application to anyone who is less than a perfect physical specimen. The protections afforded by the statutes are not intended for those who may have only a slight or marginal impairment.[5]
The Louisiana statutory framework allows a person to be classified as handicapped if he or she in fact is handicapped, or if he or she is "regarded as" handicapped. If a person is not found to have a "known physical limitation," then they are not owed a "reasonable accommodation." La. R.S. 23:322(9). It follows then, that it is not necessary for an employer to make accommodations for a physical limitation that does not exist. Likewise, an employee cannot prove discrimination or adverse action by a failure to accommodate a nonexistent physical limitation. La. R.S. 23:323.
It is revealing that Exxon's own internal documents reflect that Ms. Beaumont was "permanently partially disabled," and that Mr. Balhoff prohibited plaintiff from driving Exxon vehicles. While this could be sufficient to prove that Exxon "regarded" Ms. Beaumont "as disabled," it does not prove she is disabled in fact.
In making this distinction we address plaintiff's argument that the jury was manifestly erroneous because it answered the first interrogatory negatively. (The interrogatory did not make this distinction.) The fact that an interrogatory may be complex does not necessarily lead to a finding of manifest error.
*983 We find the lack of clarity of the jury instructions does not influence the outcome of this case for two reasons. First, the plaintiff did not object to the jury instruction; [6] the instruction was not erroneous; and the perceived lack of clarity was not such that it prevented the jury from reaching a verdict based on the law and facts of the case. Clark v. Jesuit High School of New Orleans, 96-1307, 686 So.2d 998, 1003 (La.App. 4 Cir. 12/27/96). Second, because pre-supposing Exxon regarded plaintiff as disabled, plaintiff still proved no discriminatory or adverse action on the part of Exxon. Exxon cannot be liable for not providing reasonable accommodations to someone who is simply deemed to be (or "regarded as") disabled or handicapped. In other words, given a finding that Exxon regarded plaintiff as disabled, plaintiff still needed to prove that Exxon took adverse or discriminatory action against her, other than lack of reasonable accommodation. If a trier of fact does not find a plaintiff to be disabled or handicapped, then no reasonable accommodation is required.
The fact that Exxon terminated her employment almost two years after plaintiff took medical leave and collected disability, does not amount to discrimination. Exxon's basis for termination was not predicated upon how they regarded plaintiff, but rather on their lack of desire to create a part time position. In other words, Exxon did not want to change the job description and requirements for the position plaintiff held for employment. La. R.S. 23:323 states that a person need be "otherwise qualified."[7]
Other than plaintiff's evidence showing that Exxon did not provide reasonable accommodations, there is no sufficient proof in the record of acts that were adverse or discriminatory on the part of Exxon. Therefore, plaintiff's burden of proof was to show that she was indeed handicapped or disabled in fact according to Louisiana law.
Protected Class of Disabled People
In determining whether or not a claimant falls within the protected class of handicapped or disabled persons, we find federal interpretation of the Americans with Disabilities Act 42 U.S.C.A. 12101, et seq. (A.D.A.) to be persuasive because the Louisiana anti-discrimination law follows its wording. See Allison Duncan, Defining Disability in the ADA: Sutton v. United Airlines, Inc., 60 La. L.Rev. 967, 982 (2000). If plaintiff is not a disabled person as defined by the anti-discrimination statutes then she is not entitled to accommodations.
The United States Supreme Court recently reiterated that "merely having an impairment does not make one disabled" for purposes of the disability discrimination laws. Toyota Motor Mfg., Kentucky, Inc., v. Williams, 534 U.S. 184, 195, 122 S.Ct. 681, 690, 151 L.Ed.2d 615 (2002). Instead, a claimant must be "substantially limited" in a major life activity to qualify as disabled, and "[s]ubstantially in the phrase substantially limits' suggests `considerable' or `to a large degree,'" and that "the word `substantial' thus clearly precludes impairments that interfere in only a minor way ..." Id., 534 U.S. at 196-97, 122 S.Ct. at 691.
Furthermore:
It is insufficient for individuals attempting to prove disability status under this *984 test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those "claiming the Act's protection ... to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience... is substantial. Albertson's, Inc. v. Kirkingburg, supra, [527 U.S. 555], at 567, 119 S.Ct. 2162, [144 L.Ed.2d 518] (holding that monocular vision is not invariably a disability, but must be analyzed on an individual basis, taking into account the individual's ability to compensate for the impairment).
Id., 534 U.S. at 198, 122 S.Ct. at 691-92.
The trial testimony of plaintiff's expert, John Wakeman, Ph.D., her treating neuropsychologist, indicated that Ms. Beaumont suffered permanent brain injury in the 1990 automobile accident and that cognitive deficits resulted and remained as late as 1993. Plaintiff also presented the testimony of Marilyn Skinner, M.D., with whom Ms. Beaumont underwent extensive psychotherapy and medication management for treatment of major depression, post-traumatic stress disorder and postconcussive syndrome triggered by the injuries she suffered in the automobile accident. Dr. Maher's testimony and a letter from Ms. Beaumont's opthalmologist addressed an ocular muscle imbalance which resulted from Ms. Beaumont's closed head injury in the 1990 accident. That imbalance caused visual fatigue which necessitated the use of prism glasses and frequent rest intervals.
Nevertheless, under the Toyota Motor Mfg. Kentucky standard, Beaumont's physicians' testimony is insufficient to establish that Beaumont was "handicapped" absent "evidence that the extent of the limitation ... [caused by the impairment] in terms of [her] own experience ... is substantial." Id. As to Beaumont's experience, in this court she only cites her complaints about her ability to focus and work, whereas the jury heard plaintiff testify that she actually could work 18 hour days whenever necessary; that she could drive a car and ski in Colorado when she was supposedly disabled; and that she was able to practice law at a sophisticated level.
The jury also heard Ms. Beaumont testify that she sometimes worked 12-18 hours three days in a row, without naps, during the period of time in which she alleged she was substantially impaired and handicapped.
Moreover, the jury heard that while she was collecting payments from Exxon's disability policy, plaintiff returned to graduate school and completed the bulk of a master's degree in international studies and trade. When questioned regarding her professional activities after leaving Exxon, she acknowledged that she had "worked very much on this file myself; that she performed legal work "for companies, corporations doing corporate kind of work, transactional work or incorporating contracts ..."; that she maintains a computer office in her house and travels to clients and law offices; and she has used her Spanish language skills to develop contracts for a company in the oil and gas construction industry. She told the jury about her international work involving Mexican contracts and a project where she traveled to Venezuela and provided the legal services necessary to form subsidiary corporations in Venezuela and to comply with Venezuelan regulatory programs and tax requirements. Also, the jury heard her testify that she pursued graduate studies to take "my existing language in law and broaden it out to use it in an international setting, like in the Venezuela case or in the Mexican contracts". In addition, she testified that she worked for attorneys *985 that hired her for particular jobs on an independent basis and work for an international maritime reconstruction firm.
The severity of plaintiff's handicap was called into question by Dr. Skinner. Dr. Skinner testified that Beaumont "managed her own litigation very frequently. I've never seen anything like it in my life. She worked hours, and hours, and hours writing all kinds of legal documents ... memos and memoranda.... She was having to oversee a massive amount of the work being done for her ...".
Finally, plaintiff even called attention to her trial participation to emphasize that she was physically able to work long hours. When questioned regarding whether she had advised Balhoff that she could only work 6 hours at a time, plaintiff responded that Dr. Wakeman had recommended that for the purpose of accommodation only and stated that I'm present here at trial everyday for more than 6 hours for the past couple of weeks.
The jury had extensive evidence to support a finding that although plaintiff may have had some impairment, she did not have a major impairment. As a result, it was not unreasonable for the jury to find that plaintiff did not fall into the protected class of "handicapped/disabled" people as defined by La. Revised Statutes 46:2253, 23:322(3) and 51:2232.
In sum, even though this court might have arrived at a different conclusion, we cannot disturb a finding of fact on appeal unless it be manifestly erroneous. The jury had a reasonable basis for their conclusions.

Denial of Mistrial
Finally, plaintiff argues that the trial court erred in declining to declare a mistrial because of defense counsel's conduct in the presence of the jury and because of an ex parte communication. An appellate court may not disturb a trial court's denial of a motion for mistrial absent a showing of an abuse of discretion. Estate of Cristadoro v. Gold Kist, Inc., XXXX-XXXX (La.App. 4 Cir. 1/23/02), 819 So.2d 1034, 1049. Mistrials are granted only upon proof that there has been such prejudice to a party during trial that it cannot be cured by admonition or instruction to the jury. Coleman v. Deno, 1999-2998 (La.App. 4 Cir. 4/25/01), 787 So.2d 446, 466.
The contested communications between Exxon counsel and Dr. Mestayer occurred. However, Dr. Mestayer did not testify live at trial. Instead, portions of his deposition taken several years before trial were read to the jury. The testimony of Dr. Mestayer was not affected in any way by the disputed communications and they provide no grounds for the setting aside the jury's verdict.
Similarly, Beaumont's complaint that error occurred during the reading of Dr. Mestayer's deposition does not withstand scrutiny. The record shows that Beaumont's counsel convened a discussion with the trial court and opposing counsel when the page containing the disputed testimony was being read.
The context of the testimony confirms that no error occurred. Prior to Dr. Mestayer's testimony, Dr. Skinner opined that Beaumont's involvement in multiple litigations had contributed to her problems with alleged depression. It follows that Mestayer, as a physician who treated Beaumont, could likewise be asked if having two lawsuits could cause stress or aggravate conditions such as bipolar disorder or depression. This is particularly true where the trial court had already allowed Skinner to testify as to whether Beaumont's alleged depression could be linked to litigation other than this case. Therefore, there is no prejudice that occurred concerning *986 Dr. Mestayer so as to merit the reversal of the jury.
La.Code of Evidence article 408(A) states that evidence of compromise is not admissible to prove invalidity of the claim or its amount. In a subsequent sentence though the Article states:
This article also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness....
While defense counsel referred to "other proceedings", at no point did he mention settlement or the amount of the award. Obviously the trial court deemed that defense counsel was attacking the plaintiff's credibility and did not make it impossible for the jury to reach a proper judgment.
In any event, the trial court sought to remedy any prejudice that may have occurred during the trial. First the trial court made certain that the jury understood that counsel's argument was not to be treated as evidence. After opening arguments, the trial court stated:
Ladies and gentlemen of the jury, you have just heard the opening statements from the attorneys, which is what the lawyers had to say about the case. The statements of counsel were merely their suggestions to you as to what they think the evidence is. You must distinguish between their argument and the evidence. The parties will now present their evidence.
After closing arguments, the trial court admonished the jury:
Also, you have heard what the lawyer's had to say about the evidence and their arguments. You must distinguish between that which counsel may have said by way of argument and the evidence upon which those arguments are based.
Just because the lawyer says something is a fact does not mean it is so, no matter how many times it has been repeated by the lawyer in argument.
The arguments of counsel are nothing more than their suggestions to you at to what they think the evidence is and what it has proven. You may accept or disregard these suggestions as you see fit. What the evidence is and what it has proven is for you and you alone to determine.
In Roger v. Dufrene, 97-1946 (La.App. 4 Cir. 9/9/98), 718 So.2d 592, which was an injured motorists' personal injury action against employee's employer and its insurers, we found that any possible prejudicial effect which might have resulted from defense counsel's statements that injured motorists settled with driver of vehicle and his insurer was cured by the trial court's admonitions to the jury explaining that jury was to ignore and not consider fact that driver or anyone else was no longer party to action.
Similarly, the Supreme Court gave appellate courts a standard for prejudicial effects when it noted:
The trial judge is in a better position than an appellate court to determine possible prejudicial effects resulting from counsel's argument before a jury. Therefore his finding that counsel for plaintiff's argument was not so prejudicial as to warrant the granting of a new trial should be accorded much weight.
Temple v. Liberty Mutual Ins. Co., et al., 330 So.2d 891, 894 (La.1976).
This standard is appropriate in this case because during a three-week long trial involving very sophisticated attorneys, some disputes are inevitable. Under the circumstances, the trial court's denial of plaintiff's motion for mistrial was not an abuse of discretion.
*987 The Judgment is affirmed.
AFFIRMED.
NOTES
[1] FMS (fibromyalgia syndrome) is a widespread musculoskeletal pain and fatigue disorder for which the cause is still unknown. Fibromyalgia means pain in the muscles, ligaments, and tendonsthe soft fibrous tissues in the body.
[2] In 1991 the plaintiff's supervisor was Mark Harrison and in 1992, Paul Wright.
[3] For background on Louisiana's anti-discrimination statutes in Titles 23 and 51 See 37 Loy. L.Rev. 313.
[4] 42 U.S.C.A. 12102 states: "The term "disability" means, with respect to an individual(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."
[5] This is the methodology of federal courts in A.D.A. litigation, which we adopt. See 64 U. Cin.L.Rev. 189.
[6] Seal v. State Farm Fire & Casualty Co., 2000-2375 (La.App. 4 Cir. 3/20/02), 816 So.2d 868, 871, writ denied, XXXX-XXXX (La.6/14/02), 817 So.2d 1160.
[7] This prong of analysis we need not explore due to the finding that plaintiff was not disabled.